# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JESSICA MICHELLE BOOZER, as the Personal Representative of the Estate of Jeffrey T. Hoernemann, deceased; CHELSEA LEE SPENDLOVE, as the Personal Representative of the Estate of Eric V. Spendlove, deceased; ANNE VERVALEN-GROSHONG, as the personal representative of the Estate of Jacob Michael Galliher, deceased; BROOKE UNRATH, as the Personal Representative of the Estate of Luke A. Unrath, deceased; HOWARD BRAYMAN, as the Personal Representative of the Estate of Terrell K. Brayman, deceased; GABRIELA LAVOY, as the Personal Representative of the Estate of Zachary Lavoy, deceased; RUYEILLISS NIEVES, as the Personal Representative of the Estate of Jake M. Turnage, deceased; and TINA NUTTER, as the Personal Representative of the Estate of Brian Johnson, deceased, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> BELL TEXTRON, INC.; THE BOEING COMPANY; and UNIVERSAL STAINLESS & ALLOY PRODUCTS, INC., <br><br> *Defendants.* | **CIVIL ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br><br><br><br><br><br><br><br><br> **CASE NO.** |

## CIVIL ACTION COMPLAINT

1.      This case arises from the fatal crash of a U.S. Air Force V-22 "Osprey" aircraft with Tail Number 10-0054 which was assigned callsign "GUNDAM 22."

2.      On November 29, 2023, GUNDAM 22 suffered a catastrophic failure in-flight and a subsequent impact into the Pacific Ocean off the coast of Yakushima Island, Japan, tragically killing Plaintiffs' decedents, who were U.S. service members and the aircraft's crew during a training mission (the "Accident").

## THE PARTIES

3.      Plaintiff Jessica M. Boozer was appointed the personal representative of the Estate of Jeffrey T. Hoernemann, deceased, with Letters of Administration issued by the Circuit Court of Santa Rosa County, Florida, Probate Division, File No. 2025 CP 000072. Plaintiff, through counsel, filed a Petition for an Ancillary Estate with the Philadelphia County Register of Wills.  Plaintiff Jessica M. Boozer is a citizen of Texas. At the time of his death, Jeffrey T. Boozer, deceased, was a citizen of Florida.

4.      Plaintiff Chelsea Lee Spendlove was appointed the personal representative of the Estate of Eric V. Spendlove, deceased, with Letters of Administration issued by the Circuit Court of Pinellas County, Florida, Private Division, File No. 2025 CP 001582Plaintiff, through counsel, filed a Petition for an Ancillary Estate with the Philadelphia County Register of Wills. Plaintiff Chelsea

Lee Spendlove is a citizen of Utah. At the time of his death, Eric V. Spendlove, deceased, was a citizen of Florida.

5.      Plaintiff Ivy Anne Vervalen-Groshong was appointed the personal representative of the Estate of Jacob Michael Galliher, deceased, with Letters of Administration issued by the Circuit Court of the First Judicial Circuit, for Okaloosa County, Florida, Probate Division, File No. 2024-CP-000325.  Plaintiff, through counsel, filed a Petition for an Ancillary Estate with the Philadelphia County Register of Wills. Plaintiff Ivy Vervalen-Groshong is a citizen of Maine. At the time of his death, Jacob Michael Galliher, deceased, was a citizen of Florida.

6.      Plaintiff Brooke Unrath was appointed the special administrator of the Estate of Luke A. Unrath, deceased, with Letters of Administration issued by Superior Court of California, County of Riverside, Case No. PRR12500063 Plaintiff, through counsel, filed a Petition for an Ancillary Estate with the Philadelphia County Register of Wills. Plaintiff Brooke Unrath is a citizen of Florida. At the time of his death, Luke A. Unrath, deceased, was a citizen of California.

7.      Plaintiff Howard Brayman was appointed Fiduciary of the Estate of Terrell K. Brayman, deceased, with Letters Testamentary issued by Surrogate's Court of the State of New York, County of Monroe at Rochester, New York, File No. 2024-518.  Plaintiff, through counsel, filed a Petition for an Ancillary Estate

with the Philadelphia County Register of Wills. Plaintiff Howard Brayman is a citizen of New York. At the time of his death, Jeffrey T. Boozer, deceased, was a citizen of New York.

8.    Plaintiff Gabriela Lavoy was appointed personal representative of the Estate of Zachary E. Lavoy, deceased, with Letters of Administration issued by the Circuit Court for Santa Rosa, County, Florida, Probate Division, File No. 2024 CP 000384. Plaintiff, through counsel, filed a Petition for an Ancillary Estate with the Philadelphia County Register of Wills. Plaintiff Gabriela Lavoy is a citizen of Texas. At the time of his death, Zachary E. Lavoy, deceased, was a citizen of Florida.

9.    Plaintiff Ruyeilliss Nieves was appointed the personal representative of the Estate of Jake M. Turnage, deceased, with Letters of Administration issued by the Circuit Court for Santa Rosa, County, Florida, Probate Division, File No. 2025 CP 000074. Plaintiff, through counsel, filed a Petition for an Ancillary Estate with the Philadelphia County Register of Wills. Plaintiff Ruyeilliss Nieves is a citizen of Florida. At the time of his death, Jake M. Turnage, deceased, was a citizen of Florida.

10.    Plaintiff Tina M. Nutter was appointed as fiduciary of the Estate of Brian K. Johnson, deceased, with Letters of Authority issued by the Probate Court of Licking County, Ohio, Case No. 20240896.    Plaintiff, through counsel, filed a Petition for an Ancillary Estate with the Philadelphia County Register of Wills.

Plaintiff Tina M. Nutter is a citizen of Ohio. At the time of his death, Brian K. Johnson, deceased, was a citizen of Ohio.

11.    Defendant BELL TEXTRON, INC. ("BELL") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 3255 Bell Flight Blvd., Fort Worth, Texas 76118, which at all times relevant was and is registered with the Pennsylvania Secretary of State to do business in Pennsylvania via Secretary of State filing number 755897.

12.    Defendant THE BOEING COMPANY ("BOEING") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 929 Long Bridge Drive, Arlington, Virginia 22202, who at all times relevant was and is registered with the Pennsylvania Secretary of State to do business in Pennsylvania via Secretary of State filing number 40342.

13.    Defendant UNIVERSAL STAINLESS & ALLOY PRODUCTS, INC. ("UNIVERSAL STAINLESS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Bridgeville, Pennsylvania.    At all times relevant, UNIVERSAL STAINLESS, was and is registered with the Pennsylvania Secretary of State to do business in Pennsylvania via Secretary of State filing number 2591923. It defectively manufactured the metal alloy for use in the gearbox of the Bell Boeing V-22 Osprey that crashed and killed eight Air Force service members.

14.     Defendants BELL, BOEING, and UNIVERSAL STAINLESS are referred to collectively herein as "Defendants" unless otherwise specified.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

16.     This Court has personal jurisdiction over all Defendants, and each of them individually, as UNIVERSAL STAINLESS' principle place of business is in the Commonwealth of Pennsylvania; defendants BELL and BOEING registered as foreign corporations to do business in the Commonwealth of Pennsylvania by virtue of 42 Pa. Cons. Stat. § 3101(a)(2)(i) and the holding of *Mallory v. Norfolk Southern Railroad Co.*, 600 U.S. 122 (2023).

17.     This Court has personal jurisdiction over all Defendants, and each of them, consistent with the Due Process clause of the United States Constitution because all Defendants, and each of them individually, have purposefully availed themselves of Pennsylvania's benefits, the claims stated herein arise out of or relate to Defendants' contacts with the forum, and the exercise of jurisdiction over Defendants by this Court comports with traditional notions of fair play and substantial justice, because Defendants:

a.    are registered to do business in Pennsylvania as alleged in paragraphs 11 through 13;

b.    operate, conduct, engage in, or carry on a business in this state or have an office in this state, and employ Pennsylvania residents who work in this state;

c.    placed defective products that caused harm in this state into the stream of commerce, and they have the requisite minimum contacts here such that they should fairly anticipate being hauled into court here; and/or

d.    litigated multiple lawsuits in Pennsylvania courts as both a plaintiff and defendant over the years.

18.    All at relevant times and now, none of the Plaintiffs or Decedents was or is a citizen of Pennsylvania and none of the Decedents' estates was established in Pennsylvania.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District in Philadelphia and/or Delaware Counties, where GUNDAM 22 was constructed at BOEING's facility in Ridley Park.

20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(2) because all Defendants, and each of them, are deemed to reside here and are subject to the Court's personal jurisdiction here.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(2) because all Defendants, and each of them, have the capacity to sue and be sued here.

## FACTS ABOUT THE OSPREY

22.    The V-22 Osprey aircraft is a land- and sea-based, tiltrotor, multi-mission aircraft operated by the United States Marine Corps, Navy and Air Force.

23.    The V-22 Osprey does not have ejection seats or parachutes to facilitate crew or passenger egress in the event of a catastrophic emergency.

24.    Rather, in the event of a catastrophic emergency the crew must engage in a forced landing on land or water.

25.    The V-22 Osprey's tilting "proprotors" allow the aircraft to takeoff or land vertically, like a helicopter with rotors, but fly horizontally in forward flight like an airplane with propellers.



*Photo of V-22 in vertical flight*



*Photo of V-22 in forward flight*

26.    The complex moving engine and proprotor assembly has a transmission-type system that is supposed to provide redundancy and power to both proprotors in the event that one engine fails.

27.    The vertical flight characteristics of the V-22 Osprey are supposedly advantageous over a traditional airplane because they supposedly allow for takeoff and landing without a runway or airport.

28.    The forward flight characteristics of the V-22 Osprey are supposedly advantageous over a traditional helicopter because they supposedly allow for faster transit.

29.    However the aircraft, as fielded, has failed and continues to fail to meet the government's safety and reliability specifications and requirements and the aircraft is not safe in the vertical operating mode, horizontal operating mode, or any transitional or other operating mode in between.

30.     On Thursday, September 28, 2023 the United States Department of Justice announced that BOEING resolved "allegations that it violated the False Claims Act by submitting false claims and making false statements in connection with contracts with the U.S. Navy to manufacture the V-22 Osprey, a tiltrotor military aircraft." **(Exhibit A, Dept. of Justice Press Release Sept. 23, 2023)** (highlighting supplied).

31.     On December 31, 2023 the United States House of Representatives' Committee on Oversight and Accountability sent a letter to the Secretary of Defense summarizing the safety and reliability problems with the Osprey and requested eight categories of documents related to Osprey safety.  **(Exhibit B, Letter, Dec. 21, 2023).**

32.     In April 1982, BELL collaborated with the company then known as Boeing Rotorcraft Systems to form the BELL-BOEING partnership, which ultimately designed and developed the BELL BOEINGV-22 Osprey, a tilt-rotor aircraft that combines vertical takeoff, hover, and landing qualities of a helicopter with the flight capabilities of a turboprop aircraft.

33.     BOEING specifically manufactures and integrates the fuselage, cockpit, avionics, and flight-control systems of the BELL BOEING V-22 Osprey in Ridley Park, Pennsylvania.

34.    BELL's responsibility over the BELL BOEING V-22 Osprey consists of manufacturing and integrating the wing, transmissions, empennage, and rotor systems, as well as integrating the aircraft's ROLLS-ROYCE engines.

35.    Historically, the first two BELL BOEING V-22 Ospreys were delivered in 2000 and the first operational BELL BOEING V-22 Osprey was delivered to the Air Force in September 2005.

36.    BELL and/or BOEING, either individually, collectively, or as a joint venture, published instructions, guidance, and/or warnings for the operation of V-22 Osprey aircraft and, pursuant to a contract, provided those instructions, guidance, and/or warnings to the military for inclusion in the final operating manuals that were ultimately published by the military.

37.    The instructions, guidance, and/or warnings for the operation of V-22 Osprey aircraft provided by Defendants BELL and/or BOEING were relied upon by the military services in general, military members specifically, and Plaintiffs' decedents particularly.

38.    Moreover, under military regulations that govern Defendants BELL and/or BOEING as suppliers of military equipment, both BELL and BOEING had ongoing duties to update the military about the instructions, guidance, and/or warnings.

## FACTS ABOUT AEROSPACE MATERIALS

39.    An "alloy" is simply a combination of two or more metals.

40.    For example, steel is an alloy that typically consists of iron and carbon, with other metals added to improve its properties for particular applications.

41.    Similarly, stainless steel is a generic term for an alloy with iron, carbon, and other metals that resists rust and oxidation.

42.    An "ingot" is an unfinished piece of relatively pure metal or alloy that is used in the manufacturing process.

43.    The "purity" of an alloy is a measure of its primary metal content, which directly influences its properties and suitability for specific applications.

44.    An "inclusion" in a steel alloy is an unintended non-metallic particle or compound that is present in the steel mix that has a negative impact on steel properties.

45.    Alloys are used in aerospace applications for their strength, durability, and resistance to cracking and fatigue in high-temperature, pressure, and stress environments.

46.    Alloys used in Osprey aircraft were advertised by Defendants to be "premium quality" which provide "great fracture toughness and impact strength" as well as "excellent fatigue strength."   **(Exhibit C, Universal Stainless Webpage)**.

## FACTS ABOUT OSPREY GEARBOXES, MATERIALS AND KNOWN RISKS

47.     There are two gearboxes on each Osprey, they transmit power from the engines to the Proprotors and they are each called a "Proprotor Gearbox," abbreviated "PRGB" in the aircraft's operating manuals.

48.     Each PRGB contains five high-speed pinion gears and six low-speed pinions. These pinions are made from an alloy manufactured by Defendant UNIVERSAL STAINLESS (and sometimes other vendors). This metal is a specialized alloy used in high performance aircraft engines.

49.     Defendant UNIVERSAL STAINLESS provided the alloy that was used in creating the pinion gears on the aircraft that is the subject of this lawsuit.

50.     The alloy in question was made at a UNIVERSAL STAINLESS facility in Dunkirk, New York.

51.     Since the early 2000s, the Dunkirk manufacturing facility has been plagued by quality control problems – a fact known to Defendants BELL and BOEING. The quality control issues are several, including but not limited to inclusions of aluminum oxide and manganese sulfide in the alloy, as well as carbide networks, resulting in the alloy becoming brittle and chipping more than would be expected when under stress, pressure, or torque.

52.     These problems have been exacerbated by the fact that the equipment at the Dunkirk facility dates back to the 1950s, meaning that it is impossible to

purchase original replacement parts for some of the machines that manufacture alloys at that facility.

53.    All Defendants made business decisions to forego equipment and safety upgrades to ensure properly manufactured alloys and that ensure that the government's material specifications for the construction of the Osprey are met.

54.    The Dunkirk facility has also been plagued by safety problems, with some employees reportedly complaining that the focus of Defendant UNIVERSAL STAINLESS has been on profits vice safety, in the hope that high profits would lead to a buyout by a larger company.

55.    Upon information and belief, Defendant UNIVERSAL STAINLESS did not want to spend the money on more modern equipment at Dunkirk, for fear that the expense would make it less profitable or increase the expense of its product. Other, more modern, techniques of manufacturing alloys are more expensive but can create products with higher purity and therefore higher safety.

56.    Changing the amount and location of ingot selection in the manufacturing process can result in alloys with increasing or decreasing purity. Defendant UNIVERSAL STAINLESS repeatedly made choices which sacrificed purity and therefore safety and suitability for specific application in the Osprey.

57.    In addition to problems with purity, the alloy produced by Defendant UNIVERSAL STAINLESS also contains carbide networks – a saturation of carbon – which increases wear resistance but makes the metal more brittle.

58.    Indeed, other manufacturers of the alloy use a more modern technique of alloy production that results in an alloy with fewer inclusions and more purity, creating a more resilient metal and an alloy that limits the formation of carbide networks.

59.    Defendants BELL and BOEING did not obtain alloy from these improved sources because the improved alloys were more expensive.

60.    At all times relevant, Defendants BELL and BOEING knew that the alloy from Defendant UNIVERSAL STAINLESS was not the equivalent of other manufacturers but that it was vastly inferior.

61.    At all times relevant, Defendants BELL and BOEING knew that the alloy from Defendant UNIVERSAL STAINLESS did not meet the government's material specifications for Osprey aircraft.

62.    At all times relevant, Defendants BELL and BOEING had contractual obligations to supervise their suppliers and vendors to ensure supplier/vendor quality control and to ensure the quality of the finished Osprey aircraft.

63.    In 2014, Bell and Boeing gave the U.S. Government a risk report about the UNIVERSAL STAINLESS alloy, which falsely minimized its quality problems.

The U.S. Government rejected Defendants' risk report and implemented "contractual financial withholds" which required UNIVERSAL STAINLESS to take corrective action.

64.    Despite the "contractual financial withholds" Defendants BELL, BOEING, and UNIVERSAL STAINLESS made no attempt to correct the identified deficiencies because it was not cost effective to do so.

65.    Defendants BELL and BOEING kept buying the alloy from UNIVERSAL STAINLESS because it was cheaper, even though BELL and BOEING knew other alloy suppliers, using other manufacturing methods, produced an alloy that met the Osprey's material specifications.

66.    Defendant UNIVERSAL STAINLESS was the principal supplier of alloy for the Osprey PRGB pinions.

67.    Both BELL and BOEING knew of the manufacturing and quality problems at the Dunkirk facility and of the problems with the alloy offered, but they elected to use the alloy to make the pinions, a safety-critical part, for the Osprey at issue in this case.

68.    Defendants BELL and BOEING deceived the government by generating documents that alleged that the failure of Universal Stainless' defective alloy would not significantly increase the risk of a crash.

69.    In 2014, Defendants produced a safety analysis for the U.S. government which admitted that if the Osprey PRGB pinion failed, it could lead to a catastrophic loss.

70.    However, Defendants BELL and BOEING falsely asserted the probability of a catastrophic gear failure using junk science and deceptive statistics which they knew did not accurately reflect the real probability of catastrophic loss.

71.    Specifically, to lower the risk factor that was reported to the government, the BELL and BOEING engineers falsely represented, without any evidence, that there was only a fifty percent (50%) chance that an alloy failure would result in an imminent crash.

72.    The knowingly false statistics generated by the engineers without adequate scientific basis classified the risk as "remote."

73.    Defendants knew that a risk classified higher than "remote" would have required an immediate escalation of the risk report to all military branches flying the Osprey.

74.    Defendants knew that by falsely classifying the risk as low, they would escape further scrutiny of their selection of cheap and inferior materials that did not meet material specifications.

## FACTS ABOUT OTHER RELEVANT OSPREY SYSTEMS

75.    Each PRGB has an integrated lubricating oil system which is meant to ensure operation and longevity of machinery by reducing friction, wear, and heat generation between moving parts.

76.    When metal parts break away from internal PRGB components, they are carried through the PRGB by the lubricating oil system, which has a continuous flow loop.

77.    When metal parts break away from internal PRGB components, that is one indication of impending failure.

78.    Each PRGB on the Osprey has "chip detectors," which are used to detect metal debris that should not be present in lubricating oil.

79.    The chip detectors have the capability to burn off unwanted debris by passing an electrical current through the chip detector electrodes.

80.    When conducive debris contacts the magnetic sensor pickup, the chip burn circuit automatically activates and attempts to electrically burn off the debris.

81.    The chip detectors are monitored by the Drive System Interface Unit, which announces to the pilots when electrically conductive debris floating in lubricating oil is captured at the chip detector electrodes and burned off.  This is done through a PRGB CHIP BURN advisory in the cockpit.

82.     The PRGB CHIP BURN advisory is **not** a warning or a caution, but is rather merely an announcement to the pilot that a chip burn has occurred.

83.     If three PRGB CHIP BURN advisories occur on the same side (left or right) the pilot is advised to "land as soon as practical."

84.     If there are unburnable chips then the PRGB CHIPS caution light illuminates, and the pilots are required to acknowledge the caution.

85.     The Osprey chip detector and Drive System Interface Unit were designed, in the event of multiple alerts on the chip detectors, to issue a further alert that the **chip detection system** has failed – even when it was operating properly and had actually detected metallic debris in the PRGB lubricating oil.

86.     The supposed chip detection system failure is announced to the pilots through a CHIP DETECTOR FAIL advisory.

87.     The CHIP DETECTOR FAIL advisory is not a caution or a warning to the pilots, it is merely an advisory alert.

88.     The Osprey therefore **falsely** notifies the pilot that the chip detection system has failed when, instead, the PRGB internal components are catastrophically deteriorating and producing metal chips and debris.

89.     This defective system does not account for the very real probability that the inferior materials and construction in the PRGBs will fail catastrophically with

many positive results which are then not displayed to the pilot but, instead, reported as an indication system failure.

90.    The defective chip detection system was premised upon BELL and BOEING's false representation that PRGB catastrophic failures are remote, with a scientific probability of a PRGB catastrophic failure of greater than one in one million.

91.    However, Defendants BELL and BOEING knew that the scientific probability of a PRGB catastrophic failure was much higher but they knowingly concealed this information from the government and/or they knowingly misrepresented probability information to the government and the military by submitting knowingly false probability statistics that were not grounded in any real science or any accepted methodology.

92.    The military approved this specific Osprey design feature described in paragraphs 77 and 90 **without** the knowledge that the probability for catastrophic failure was much higher than Defendants reported due to their knowing false reporting of the probability of catastrophic PRGB failure.

93.    According to Defendant BELL's and Defendant BOEING's guidance, if there are three PRGB CHIPS alerts that occur during an uninterrupted flight, the pilot should land "as soon as practical."

94.    When the operational guidance suggests that a pilot should land "as soon as practical" the landing site and duration of flight is at the discretion of the pilot-in-command, considering factors such as threat, remote location, local repair capability, practicality of maintenance recovery team launch, remaining aircraft system redundancy, mutual support, or other relevant factors.

95.    According to BELL and BOEING guidance, if the PRGB CHIPS alert is displayed, the pilot should "land as soon as possible."

96.    According to the BELL and BOEING guidance, when flying over water, the determination of landing "as soon as possible" is at the discretion of the pilot, with factors such as sea state, weather, communication, survival equipment, and the location of other aircraft, ships, and land will assist the pilot in deciding whether to land as soon as possible or to proceed to a point where survival and rescue are enhanced.

## **FACTS ABOUT DEFENDANTS' FALSE SAFETY ASSESSMENTS**

97.    Long before the Accident, ongoing problems with the Osprey, including crashes involving the failure of the clutch systems in the PRGB, caused the U.S. military to demand additional safety assessments from BELL and BOEING.

98.    In 2020, BELL and BOEING produced a new safety assessment. Defendants' assessment concluded that Marine Corps and Air Force Ospreys would spend 20% of their time over the ocean, while Navy craft would spend around 80%

of their time over water. Defendants' analysis led to an expected rate of catastrophic failures to be 1 in 100,000.

99.    The predicted expected catastrophic failure rate caused a problem for BELL and BOEING. They knew that the Department of Defense in 2020 required that representatives from all the various branches must provide formal agreement before accepting any equipment that designated a serious or high risk.

100.    If BELL and BOEING continued to report a catastrophic risk so high, the Osprey would be forced to be re-evaluated by the Marine Corps, Navy and Air Force **separately**, and each branch could demand its own specialized method of risk mitigation.

101.    In 2022, BELL and BOEING generated new risk assessment, assessing, without evidence, that Osprey over-water operations would occur 10% of the time for the Air Force and that the Navy's ship-based Ospreys would operate over water only 40% of the time.. Using this unsupported math changed the risk assessment of alloy failure down to a medium risk, not a serious risk. With the lower numbers, no further government review was required under the bureaucratic rules.

102.    The U.S. military relied on BELL and BOEING to give an accurate safety assessment of the risks associated with the UNIVERSAL STAINLESS alloy. By falsely under-reporting the risk, BELL and BOEING knowingly concealed the problems associated with the Osprey's PRGB.

103. Defendants intended that the government would rely upon their knowingly false risk assessment and the government did rely on it, to the detriment of over fifty (50) service members who have been killed in Osprey mishaps, including Plaintiffs' seven decedents, Major Jeffrey Hoernemann, Major Eric Spendlove, Major Luke Unrath, Major Terrell Brayman, Technical Sergeant Zachary Lavoy, Staff Sergeant Jake Turnage, Senior Airman Brian Johnson who were killed in GUNDAM 22 on November 29, 2023. **(Exhibit B, Letter, Dec. 21, 2023).**

104. After this Accident BELL and BOEING revised their operational guidance, which now requires the pilots to monitor for abnormal secondary indications after a PRGB CHIPS alert (such as vibration or erratic behavior). If secondary indications are present, the pilot should land immediately, including an immediate ditching if flying over water. Of course, this assumes that the pilot does not receive a CHIP DETECTOR FAIL advisory, which indicates that the chip detection system itself has failed.

105. Defendants continue to misrepresent the risk associated with the failure of the UNIVERSAL STAINLESS alloy and they continue to misrepresent what alloy failure effects, making it impossible to construct an adequate warning system for the pilots.

106.   Defendants BELL and BOEING, individually and/or in concert in a joint venture, also supplied to the government Osprey aircraft system descriptions, operating instructions, normal procedures, emergency procedures, and notes, warnings, and cautions about Osprey aircraft systems, normal operations, and emergency operations.

107.   The descriptions, instructions, procedures, notes, warnings, and cautions supplied to the government and to the decedents by Defendants BELL and BOEING incorporated the knowingly false risks of failure.

## THE CRASH OF GUNDAM 22

108.   On November 29, 2023, the decedents boarded GUNDAM 22 for a training mission over the waters between Japan and China.

109.   On the day of the Accident, GUNDAM 22 was piloted by Maj. Jeffrey T. Hoernemann, the aircraft commander ("PILOT"), and Maj. Luke Unrath,, the second-in-command ("COPILOT"), Major Terrell Brayman was an additional pilot onboard (the "MAP").  The PILOT, COPILOT, and MAP were highly trained and qualified professional pilots.

110.   On the day of the Accident the PILOT, COPILOT, and MAP held Commercial Pilot Certificates issued by the United States Federal Aviation Administration. **(Exhibit D, FAA Pilot Records).**

111.   At the time of the Accident PILOT, COPILOT and MAP were commercial pilots flying "for compensation and hire" and whose salaries are derived from their status as professional pilots.

112.   The training mission plan consisted of three parts.

113.   The first part was a flight from Yokota Air Base, Japan, proceed over land to Marine Corps Air Station Iwakuni, Japan.

114.   The second part of the training mission was a flight over water towards Okinawa for approximately three hours with an in-flight refueling, then land at Kadena Air Base.

115.   The third part of the mission was a planned refuel on the ground at Kadena Air Base and a return flight to Yokota Air Base.

116.   The first portion of the mission – flying overland to Iwakuni, saw no problems.

117.   However, approximately 40 minutes into the over-water portion of the flight, GUNDAM 22 suffered its first PRGB CHIP BURN advisory on the left engine. The advisory was acknowledged by the crew, and the mission went on.

118.   Thirteen seconds after the first chip burn advisory, GUNDAM 22 experienced its second PRGB CHIP BURN advisory on the left side, which was also acknowledged by the crew.

119.   Unknown to the crew, the PRGB pinions had begun to break apart.

120.    Twelve minutes after the second chip burn advisory, a third PRGB CHIP BURN alert illuminated for the left PRGB.

121.    There were no secondary indications of failure aside from the PRGB CHIP BURN advisories.

122.    After the third PRGB CHIP BURN advisory, the operational guidance for the pilots of GUNDAM 22 advised that they should "land as soon as practicable."

123.    Considering the lack of secondary indications of failure, remote location, lack of repair capability, practicality of maintenance recovery team launch, remaining aircraft system redundancy, mutual support, and other factors, the pilot elected to continue the mission, which was in accordance with BELL and BOEING guidance and instructions.

124.    Five minutes after the third chip light, the pilots received a fourth PRGB CHIP BURN advisory on the left side, and ten minutes later, a fifth PRGB CHIP BURN on the left side.

125.    The pilots and crew tried to figure out why the chip burn advisory was flickering on and off during this period. They did not and could not know that the PRGB pinion was slowly disintegrating, filling the PRGB with metal chips which, in turn, worked to progressively destroy the remainder of the PRGB.

126.   Other than the PRGB CHIP BURN advisories, there was no sign of additional problems with the aircraft.  In other words, even after five chip burn advisories, there were no secondary indications of impending failure.

127.   Ten minutes later, the PRGB CHIPS caution was announced to the crew.  Per Osprey operating guidance, the pilot scrubbed the mission and turned the plane towards Yakushima airport, their closest planned divert field.

128.   Per the Osprey operating guidance, GUNDAM 22 was now in a 'land as soon as possible' status, but, because they were over water with no suitable landing field in the water, the determination of where to land was left at the discretion of the pilot.

129.   After assessing the sea state, communication, and the location of other aircraft and ships, the pilot decided that the best place to land was the landing strip at Yakushima, a mere 11 minutes away, instead of in the water where the crew would be in a survival situation.

130.   As GUNDAM 22 approached Yakushima, a new alert went off – the CHIP DETECTOR FAIL advisory, **indicating that the chip detector itself was not working.**

131.   Defendants' defective manufacture and inadequate warnings about the chip detector system which included the CHIP DETECTOR FAIL advisory gave the

crew a false sense of safety when, in fact, catastrophe was seconds away for GUNDAM 22.

132.   Upon illumination of the CHIP DETECTOR FAIL advisory the pilot commented that he was no longer worried, because it looked to him like the previous PRGB CHIP BURN and PRGB CHIPS advisories had been due to a faulty chip detector.

133.   Based upon Defendants' inadequate warnings, the PILOT believed that he no longer faced an emergency upon illumination of the CHIP DETECTOR FAIL advisory.

134.   The PILOT then flew GUNDAM 22 in "one more big right hand loop and come in and just set up for a landing."

135.   Due to Defendants' inadequate warnings, the pilot converted GUNDAM 22 from airplane mode to helicopter mode for landing which, unknown to the crew, put additional stress on the failing PRGB.

136.   As that conversion to helicopter mode progressed, the increase in torque ripped apart the defective left PRGB pinion, shredding it and destroying the left PRGB.

137.   The left Proprotor, unable to provide any torque or lift, turned uselessly, and the GUNDAM 22 flipped over and spun into the sea, killing everyone aboard.

138.  Defendants assisted the military with the post-crash investigation despite their obvious conflict of interest.

139.  The post-crash investigation by the military, with supposed assistance from Defendants, showed that there was fatigue cracking in the left PRGB pinion gears and bearing cage and shearing of the main gear (called the "bull gear") lower drive teeth.

## COUNT I
### Pennsylvania State Law Strict Product Liability
### *Plaintiffs v. Defendant Universal Stainless*

140.  Plaintiffs incorporate by reference all previous and subsequent paragraphs as though set forth fully herein.

141.  As set forth above, Defendant UNIVERSAL STAINLESS manufactured, sold, and/or supplied alloy for critical parts and components of GUNDAM 22.

142.  On the day of the Accident and at all times material hereto, that alloy and those parts were in the same condition as when sold and/or supplied to the military.

143.  GUNDAM 22 in general and, in particular, the alloy manufactured, sold and/or supplied by Defendant UNIVERSAL STAINLESS was defective and unreasonably dangerous.

144.  GUNDAM 22 in general and, in particular, its alloy manufactured, sold, and/or supplied by Defendant UNIVERSAL STAINLESS was defective on the day it left Defendant's hands.

145.  GUNDAM 22 in general and, in particular, its alloy manufactured, sold, and/or supplied by Defendant UNIVERSAL STAINLESS was defective on the day of the Accident.

146.  GUNDAM 22 in general and, in particular, its alloy manufactured, sold, and/or supplied by Defendant UNIVERSAL STAINLESS was not materially altered between the time it left Defendant's hands and the Accident.

147.  GUNDAM 22 in general and, in particular, its alloy manufactured, sold, and/or supplied by Defendant UNIVERSAL STAINLESS, was supplied and/or sold in a defective condition that was unreasonably dangerous to its users, the U.S. military, and Plaintiffs' decedents, who all would have avoided the risks of its use had they been properly warned of those risks.

148.  The defective and unreasonably dangerous condition of GUNDAM 22 and its alloy and/or Defendant's failure to warn of its risks of defects caused the Accident, caused the deaths of heroic military personnel, caused the deaths of Plaintiff's decedents, and caused Plaintiff's damages which are in excess of $75,000 for each Plaintiff.

WHEREFORE, Plaintiffs demand judgment against Defendant UNIVERSAL STAINLESS, individually and/or jointly and/or severally, for all economic damages allowed under Pennsylvania or other applicable law, for economic and non-economic damages allowed under the Pennsylvania Survival Act and the binding precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971), for attorneys fees and costs of suit, for pre-judgment interest, post-judgment interest, and all other relief the Court deems fair and equitable.

## COUNT II
**Pennsylvania State Law Negligence and/or Gross Negligence/Recklessness**
***Plaintiffs v. Defendant Universal Stainless***

149. Plaintiffs incorporate by reference all previous and subsequent paragraphs as though set forth fully herein.

150. UNIVERSAL STAINLESS had duties established by law, by industry best practices and standards, defendants' standards, military standards, and/or safety standards, specifications, and/or regulations to manufacture the alloy used in GUNDAM 22 in an appropriate manner and to provide adequate warnings about inherent dangers and defects therein.

151. At all times material Defendant UNIVERSAL STAINLESS breached its duty in that it failed to manufacture, sell, and/or supply alloy that met specifications, standards, and/or regulations and it failed to provide adequate warnings about the inherent dangers and defects in its substandard alloy.

152.  At all times material Defendant UNIVERSAL STAINLESS acted recklessly and in a grossly negligent manner because it made intentional business decisions helpful to its financial condition but detrimental to safety to forego modern manufacturing techniques which would have rendered the alloy it provided to GUNDAM 22 in compliance with the highest military, industry, and/or safety standards, specifications, and/or regulations and in compliance with industry best practices.

153.  At all times material Defendant UNIVERSAL STAINLESS acted recklessly and in a grossly negligent manner because it made intentional business decisions to enhance profits, sacrifice safety, and withhold warnings about the inherent dangers and defects in its substandard alloy.

154.  As a direct and/or proximate result of UNIVERSAL STAINLESS' breaches of its duties, its intentional, reckless, grossly negligent, and/or negligent conduct, the pinions made of its alloy in GUNDAM disintegrating during flight and the military was not warned about the defects in the pinion alloy, both of which, individually or in some combination, caused the Accident, caused the deaths of Plaintiffs' decedents, and caused damages to Plaintiffs which are in excess of $75,000 for each Plaintiff.

WHEREFORE, Plaintiffs demand judgment against Defendant UNIVERSAL STAINLESS, individually and/or jointly and/or severally, for all economic damages

allowed under Pennsylvania or other applicable law, for economic and non-economic damages allowed under the Pennsylvania Survival Act and the binding precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971), for punitive damages should Plaintiffs prove gross negligence, recklessness, and/or intentional conduct, for attorneys fees and costs of suit, for pre-judgment interest, post-judgment interest, and all other relief the Court deems fair and equitable.

## COUNT III
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) 73 Pa. Stat. §§ 201.1 *et seq.*
### *Plaintiffs v. Defendant Universal Stainless*

155. Plaintiffs incorporate by reference all previous and subsequent paragraphs as though set forth fully herein.

156. As set forth above, Defendant UNIVERSAL STAINLESS is a commercial vendor of aerospace alloys including alloys supplied for parts on GUNDAM 22.

157. Defendant UNIVERSAL STAINLESS engaged in "trade" and "commerce" as that term is defined by 73 Pa. Stat. § 201-2(3) by advertising, offering for sale, selling or distributing, aerospace alloy for GUNDAM 22 from Pennsylvania for inclusion into Osprey aircraft which are manufactured and/or assembled by Defendant Boeing in Pennsylvania and directly or indirectly affecting the people of this Commonwealth.

158.   Defendant UNIVERSAL STAINLESS engaged in unfair methods of competition and/or unfair or deceptive acts or practices by advertising that its alloys were of "premium quality" when in fact they were of inferior quality, not fit for use in tilt rotorcraft gear boxes, and not safe for flight.  **(Exhibit C, Universal Stainless Website)**.

159.   Defendant UNIVERSAL STAINLESS engaged in unfair methods of competition and/or unfair or deceptive acts or practices by representing that its alloys were produced to five industry standards and received four industry approvals when, in fact, the alloy at issue did not meet standards and was not eligible for approvals. **(Exhibit C, Universal Stainless Website)**.

160.   Plaintiffs' decedents relied to their detriment upon Defendant UNIVERSAL STAINLESS unfair or deceptive acts or practices by placing their lives at risk when, had they known that critical parts of GUNDAM 22 were inferior and did not meet standards they would not have risked their lives in a machine that was not safe, airworthy, or met standards as advertised.

161.   Plaintiffs themselves relied to their detriment upon Defendant UNIVERSAL STAINLESS' unfair or deceptive acts or practices because, had they known that critical parts of GUNDAM 22 were inferior and did not meet standards they would not have allowed their loved ones to risk their lives in a machine that was not safe, airworthy, or met standards as advertised.

162.   As a result of Plaintiffs' and Plaintiffs' decedents' detrimental reliance, they have suffered damages in excess of $75,000 for each Plaintiff

WHEREFORE, Plaintiffs demand judgment against Defendant UNIVERSAL STAINLESS, individually and/or jointly and/or severally, for all economic damages allowed under Pennsylvania or other applicable law, for economic and non-economic damages allowed under the Pennsylvania Survival Act and the binding precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971), for treble damages should Plaintiffs prove unfair or deceptive acts or practices, for attorneys fees and costs of suit, for pre-judgment interest, post-judgment interest, and all other relief the Court deems fair and equitable

## COUNT IV
### Pennsylvania State Law Breach of Implied Warranty of Merchantability
### *Plaintiffs v. Defendant Universal Stainless*

163.   Plaintiffs incorporate by reference all previous and subsequent paragraphs as though set forth fully herein.

164.   As set forth above, Defendant UNIVERSAL STAINLESS manufactured, sold, and/or supplied alloy for critical parts and components of GUNDAM 22.

165.   Defendant UNIVERSAL STAINLESS is a seller of alloys for aerospace purposes and is a seller of goods of the kind sold for use on GUNDAM 22.

166.  Defendant UNIVERSAL STAINLESS is a seller in the distributive chain of the alloys supplied to parts for GUNDAM 22.

167.  The alloy manufactured, sold, and/or supplied by Defendant UNIVERSAL STAINLESS was not fit for the purpose intended, namely incorporation into tilt rotorcraft gearbox pinions and other aerospace parts.

168.  The alloy manufactured, sold, and/or supplied by Defendant UNIVERSAL STAINLESS was not safe for the purpose intended, namely safe flight in tilt rotorcraft including GUNDAM 22.

169.  As a result of Defendant's breach of implied warranties, Plaintiffs have suffered damages in excess of $75,000 for each Plaintiff.

WHEREFORE, Plaintiffs demand judgment against Defendant UNIVERSAL STAINLESS, individually and/or jointly and/or severally, for all economic damages allowed under Pennsylvania or other applicable law, for economic and non-economic damages allowed under the Pennsylvania Survival Act and the binding precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971), for punitive damages should Plaintiffs prove gross negligence, recklessness, and/or intentional conduct, for attorneys fees and costs of suit, for pre-judgment interest, post-judgment interest, and all other relief the Court deems fair and equitable

## COUNT V
## Pennsylvania State Law Strict Product Liability
### *Plaintiffs v. Defendants Bell and Boeing*

170.    Plaintiffs incorporate by reference all previous and subsequent paragraphs as though set forth fully herein.

171.    As set forth above, Defendants BELL and BOEING, either individually and/or in some combination and/or in a joint venture, manufactured, assembled, sold, and/or supplied GUNDAM 22, the entire aircraft and/or the component parts at issue herein.

172.    On the day of the Accident and at all times material hereto, GUNDAM 22, the entire aircraft and/or the component parts at issue herein were in the same condition as when sold and/or supplied to the military.

173.    GUNDAM 22, the entire aircraft and/or the component parts at issue herein that was manufactured, assembled, sold and/or supplied by Defendants BELL and BOEING was defective and unreasonably dangerous.

174.    GUNDAM 22, the entire aircraft and/or the component parts at issue herein that was manufactured, assembled, sold, and/or supplied by Defendants BELL and BOEING was defective on the day it left Defendants' hands.

175.    GUNDAM 22, the entire aircraft and/or the component parts at issue herein that was manufactured, assembled, sold, and/or supplied by Defendants BELL and BOEING was defective on the day of the Accident.

176.   GUNDAM 22, the entire aircraft and/or the component parts at issue herein that was manufactured, assembled, sold, and/or supplied by Defendants BELL and BOEING was not materially altered between the time it left Defendant's hands and the Accident which are in excess of $75,000 for each Plaintiff.

177.   GUNDAM 22, the entire aircraft and/or the component parts at issue herein that was manufactured, assembled, sold, and/or supplied by Defendants BELL and BOEING, was supplied and/or sold in a defective condition that was unreasonably dangerous to its users, the U.S. military, and Plaintiffs' decedents, who all would have avoided the risks of its use had they been properly warned of those risks.

178.   The descriptions, instructions, procedures, notes, warnings, and cautions about GUNDAM 22 that were supplied in aircraft manuals to the government and to the decedents by Defendants BELL and BOEING were defective and unreasonably dangerous.

179.   The defective and unreasonably dangerous condition of GUNDAM 22, the entire aircraft and/or the component parts including the manuals at issue herein and/or Defendant's failure to warn of its risks of defects caused the Accident, caused the deaths of heroic military personnel, caused the deaths of Plaintiff's decedents, and caused Plaintiff's damages.

WHEREFORE, Plaintiffs demand judgment against Defendants BELL and/or BOEING, individually and/or jointly and/or severally, for all economic damages allowed under Pennsylvania or other applicable law, for economic and non-economic damages allowed under the Pennsylvania Survival Act and the binding precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971), for attorneys fees and costs of suit, for pre-judgment interest, post-judgment interest, and all other relief the Court deems fair and equitable.

<u>**COUNT VI**</u>
**Pennsylvania State Law Negligence and/or Gross Negligence/Recklessness**
***Plaintiffs v. Defendants Bell and Boeing***

180.   Plaintiffs incorporate by reference all previous and subsequent paragraphs as though set forth fully herein.

181.   At all times material Defendants BELL and/or BOEING, and/or each of them, had legal duties to use reasonable care in the design, manufacture, assembly, sale and/or supply the aircraft, systems, and component parts of V-22 Osprey aircraft and GUNDAM 22.

182.   At all times material Defendants BELL and/or BOEING breached their legal duties and failed to use reasonable care in the design, manufacture, sale, and/or supply, of the aircraft, engines, propellers, systems, and component parts of GUNDAM 22 in that:

a. they failed to properly and adequately design aircraft and their component parts including but not limited to gearboxes, gearbox pinions, chip detectors, and chip detector warning systems;

b. they failed to properly and adequately integrate aircraft and their component parts including but not limited to gearboxes, gearbox pinions, chip detectors, and chip detector warning systems to work together as intended;

c. they failed to properly and adequately manufacture aircraft and their component parts including but not limited to gearboxes, gearbox pinions, chip detectors, and chip detector warning systems;

d. they manufactured and/or supplied a system or parts of a system that had a high risk of catastrophic failure in flight;

e. they manufactured and/or supplied a system or parts of a system that had a high risk of catastrophic failure without warning;

f. they fielded a system or parts of a system with a single point of failure without adequate redundancy or safeguards;

g. they fielded a system or parts of a system with a single point of failure without adequate warnings, instructions, or emergency procedures;

h. they obtained critical parts that were made from inferior materials;

i. they failed to properly analyze and/or test the alloy that comprised parts critical to safety of flight;

j. they failed to properly and adequately take all reasonable steps to provide the flight crew with redundancy and backup systems in the event of a system malfunction;

k. they failed to provide appropriate operating instructions, operating limitations; operating procedures; and emergency procedures for an asymmetric thrust condition;

l. they failed to timely correct the dangers in the aircraft, gearboxes, pinions, and chip detector systems about which they knew or reasonably should have known;

m. they failed to include warnings that a reasonably prudent manufacturer, assembler, supplier, and/or seller would include about the aircraft's risk of catastrophic loss of control;

n. they failed to include warnings that a reasonably prudent manufacturer, assembler, supplier, and/or seller would include about the aircraft's inferior materials;

o. they failed to include warnings that a reasonably prudent manufacturer, assembler, supplier, and/or seller would include about the aircraft's lack of redundancy in critical systems;

p. they failed to use reasonable care in the preparation of manuals, operating instructions, and/or guidance and publication of warnings of the high risk of injury and/or death associated with the operation of V-22 Osprey aircraft and GUNDAM 22.

183. At all times material Defendants BELL and/or BOEING acted recklessly and in a grossly negligent manner because they made intentional and/or reckless business decisions to enhance profits, sacrifice safety, failed to correct deficiencies, and/or withhold warnings about the catastrophic risks inherent in GUNDAM 22 about which they knew or reasonably should have known.

184. As a direct and/or proximate result of Defendants BELL's and/or BOEING's breaches of their duties, their intentional, reckless grossly negligent, and/or negligent conduct, the gearbox pinions in GUNDAM disintegrating during flight, and the military was not warned about the defects in the pinion alloy, the systems did not warn the crew of impending failure, there was no redundancy to critical safety systems, and there was a lack of proper instructions, all of which, individually or in some combination, caused the Accident, caused the deaths of Plaintiffs' decedents, and caused damages to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendants BELL and/or BOEING, individually and/or jointly and/or severally, for all economic damages allowed under Pennsylvania or other applicable law, for economic and non-

economic damages allowed under the Pennsylvania Survival Act and the binding

precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971),

for punitive damages should Plaintiffs prove gross negligence, recklessness, and/or

intentional conduct, for attorneys fees and costs of suit, for pre-judgment interest,

post-judgment interest, and all other relief the Court deems fair and equitable

**COUNT VII**
**Fraudulent Misrepresentation Under Pennsylvania State Law**
***Plaintiffs v. Defendants Bell and Boeing***

185.    Plaintiffs incorporate by reference all previous and subsequent

paragraphs as though set forth fully herein.

186.    At all times material Defendants BELL and/or BOEING, individually,

in some combination, or in a joint venture, made representations to the military that

were material to the Accident specifically including:

    a.  that Osprey aircraft including GUNDAM 22 were safe and airworthy;

    b.  that the risk of failure of gearboxes was very low;

    c.  that the materials used to make component parts including gearbox
        pinions were of high quality;

    d.  that the materials used to make component parts including gearbox
        pinions met the required standards;

    e.  that the crew would be warned of impending failures;

    f.  that there was redundancy in critical systems;

g. that there was a viable backup system that would allow the crew to survive if one engine suddenly lost power;

h. that the crew had sufficient warnings and instructions to operate the aircraft safely;

i. that the crew alerting system would warn the crew of impending failures in flight;

j. that impending failures in flight were survivable.

187. The above statements made by Defendants BELL and/or BOEING were made falsely with knowledge of their falsity or with reckless disregards as to the truth or falsity of such statements.

188. The above statements made by Defendants BELL and/or BOEING were made with the intent to mislead the military into relying upon those statements for the own financial benefit of Defendants and to the detriment of the military, service members, and Plaintiffs' decedents.

189. The military, service members, and Plaintiffs' decedents justifiably relied upon the knowing and/or recklessly false statements listed above and such justifiable reliance proximately caused the crash of GUNDAM 22, the deaths of Plaintiffs' decedents, and Plaintiffs' damages which are in excess of $75,000 for each Plaintiff.

WHEREFORE, Plaintiffs demand judgment against Defendants BELL and/or BOEING, individually and/or jointly and/or severally, for all economic damages allowed under Pennsylvania or other applicable law, for economic and non-economic damages allowed under the Pennsylvania Survival Act and the binding precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971), for punitive damages should Plaintiffs prove fraudulent misrepresentation, for attorneys fees and costs of suit, for pre-judgment interest, post-judgment interest, and all other relief the Court deems fair and equitable.

## COUNT VIII
### Negligent Misrepresentation Under Pennsylvania State Law
### *Plaintiffs v. Defendants Bell and Boeing*

190.  Plaintiffs incorporate by reference all previous and subsequent paragraphs as though set forth fully herein.

191.  At all times material Defendants BELL and/or BOEING, individually, in some combination, or in a joint venture, made representations to the military that were material to the Accident specifically including:

   a.  that Osprey aircraft including GUNDAM 22 were safe and airworthy;

   b.  that the risk of failure of gearboxes was very low;

   c.  that the materials used to make component parts including gearbox pinions were of high quality;

d.  that the materials used to make component parts including gearbox pinions met the required standards;

e.  that the crew would be warned of impending failures;

f.  that there was redundancy in critical systems;

g.  that there was a viable backup system that would allow the crew to survive if one engine suddenly lost power;

h.  that the crew had sufficient warnings and instructions to operate the aircraft safely;

i.  that the crew alerting system would warn the crew of impending failures in flight;

j.  that impending failures in flight were survivable.

192.  The above statements made by Defendants BELL and/or BOEING were made under circumstances in which Defendants should have known of their falsity.

193.  The above statements made by Defendants BELL and/or BOEING were made under circumstances in which Defendants failed to make a reasonable investigation of the truth of those statements.

194.  The military, service members, and Plaintiffs' decedents justifiably relied upon Defendants' false statements listed above and such justifiable reliance

proximately caused the crash of GUNDAM 22, the deaths of Plaintiffs' decedents, and Plaintiffs' damages which are in excess of $75,000 for each Plaintiff.

WHEREFORE, Plaintiffs demand judgment against Defendants BELL and/or BOEING, individually and/or jointly and/or severally, for all economic damages allowed under Pennsylvania or other applicable law, for economic and non-economic damages allowed under the Pennsylvania Survival Act and the binding precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971), for attorneys fees and costs of suit, for pre-judgment interest, post-judgment interest, and all other relief the Court deems fair and equitable.

### COUNT IX
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) 73 Pa. Stat. §§ 201.1 *et seq.***
***Plaintiffs v. Defendants Bell and Boeing***

195. Plaintiffs incorporate by reference all previous and subsequent paragraphs as though set forth fully herein.

196. As set forth above, Defendants BELL and BOEING are commercial vendors of aircraft including GUNDAM 22.

197. Defendants BELL and BOEING, individually, collectively, and/or in a joint venture engaged in "trade" and "commerce" as that term is defined by 73 Pa. Stat. § 201-2(3) by advertising, offering for sale, selling or distributing, Osprey Aircraft including GUNDAM 22 from Pennsylvania and in addition Defendants manufactured and/or assembled Osprey aircraft including GUNDAM 22 in

Pennsylvania and directly or indirectly affected the people of this Commonwealth. **(Exhibit A, Dept. of Justice Press Release Sept. 23, 2023)** (highlighting supplied).

198.  Defendants BELL and/or BOEING engaged in unfair methods of competition and/or unfair or deceptive acts or practices by representing that Osprey aircraft including GUNDAM 22 conformed with all laws, regulations, specifications, requirements, and standards when they did not.

199.  Defendants BELL and/or BOEING engaged in unfair methods of competition and/or unfair or deceptive acts or practices by falsely and/or deceptively representing:

    a.  that Osprey aircraft including GUNDAM 22 were safe and airworthy;

    b.  that the risk of failure of gearboxes was very low;

    c.  that the materials used to make component parts including gearbox pinions were of high quality;

    d.  that the materials used to make component parts including gearbox pinions met the required standards;

    e.  that the crew would be warned of impending failures;

    f.  that there was redundancy in critical systems;

    g.  that there was a viable backup system that would allow the crew to survive if one engine suddenly lost power;

h. that the crew had sufficient warnings and instructions to operate the aircraft safely;

i. that the crew alerting system would warn the crew of impending failures in flight;

j. that impending failures in flight were survivable.

200.   Plaintiffs' decedents relied to their detriment upon Defendants BELL's and/or BOEING's unfair or deceptive acts or practices by placing their lives at risk when, had they known that the aircraft did not comply with laws, regulations, specifications, requirements, and standards, they would not have risked their lives in a machine that was not safe or airworthy.

201.   Plaintiffs' decedents relied to their detriment upon Defendants BELL's and/or BOEING's unfair or deceptive acts or practices by placing their lives at risk when, had they known of Defendants' false and/or deceptive statements about Osprey aircraft, they would not have risked their lives in a machine that was not safe or airworthy.

202.   Plaintiffs themselves relied to their detriment upon Defendants BELL's and/or BOEING's unfair or deceptive acts or practices because, had they known the truth about the aircraft's lack of compliance with laws, regulations, specifications, requirements, and standards and the truth of Defendants' misleading representations

they would not have allowed their loved ones to risk their lives in a machine that was not safe, airworthy, or met standards as advertised.

203.   As a result of Plaintiffs' and Plaintiffs' decedents' detrimental reliance, they have suffered damages in excess of $75,000 for each Plaintiff.

WHEREFORE, Plaintiffs demand judgment against Defendants BELL and/or BOEING, individually and/or jointly and/or severally, for all economic damages allowed under Pennsylvania or other applicable law, for economic and non-economic damages allowed under the Pennsylvania Survival Act and the binding precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971), for treble damages should Plaintiffs prove unfair or deceptive acts or practices, for attorneys fees and costs of suit, for pre-judgment interest, post-judgment interest, and all other relief the Court deems fair and equitable.

## COUNT X
### Breach of Contract Under Pennsylvania Law
### *Plaintiffs v. All Defendants*

204.   Plaintiffs incorporate by reference all previous and subsequent paragraphs as though set forth fully herein.

205.   The United States government and the military entered into valid, performance-only contracts with Defendants BELL and/or BOEING, individually, in some combination, and/or as a joint venture, for the design, manufacture, maintenance, repair, upkeep, troubleshooting, sale, and supply of V-22 Osprey

aircraft, gear boxes, pinions, chip detectors, propulsion systems, and other systems and their component parts including for the supply of GUNDAM 22 and its systems.

206.   The United States Government and the military also entered into performance-only contracts with Defendants BELL and/or BOEING individually, in some combination, and/or as a joint venture for the creation of operating instructions, guidance, checklists, and warnings for air crew of Osprey aircraft including the crew of GUNDAM 22.

207.   Plaintiffs do not have a copy of the above-referenced contracts but they have sufficient information to form a reasonable belief that such contracts exist from the press releases, internet pages, advertisements, news stories, from and about these defendants as well as the and public information about the government procurement process.

208.   The performance-only contracts at issue did not specify the precise manner of design, construction, manufacture, maintenance, repair, upkeep, troubleshooting, or supply of the V-22 Osprey aircraft, gear boxes, pinions, chip detectors, propulsion systems, and other systems and their component parts.

209.   The performance-only contracts at issue did not specify the precise contents or substance of manuals, guidance, instructions, and/or warnings for Osprey aircraft but, rather, they merely required a specific format for these written materials.   The contents and/or substance of the Osprey manuals, guidance,

instructions, and/or warnings were left to the ultimate discretion of Defendants due to their position of superior knowledge as designers, manufacturers, and/or assemblers of the aircraft and its component parts and systems.

210.   The purpose of the contracts was to provide the government and military with aircraft, gear boxes, pinions, chip detectors, propulsion systems, and other systems and their component parts as well as written manuals, guidance, instructions and/or warnings, that would provide a safe, airworthy and superior all-weather, land- and sea-based multi-mission airborne platforms

211.   The design, manufacture, assembly, testing, and systems integration of aircraft, gear boxes, pinions, chip detectors, propulsion systems, and other systems and their component parts as well as written manuals, guidance, instructions and/or warnings were the responsibility of these defendants pursuant to the contracts.

212.   One material objective of the contracts was the provision of an aircraft that was airworthy and safe for flight.

213.   It was the clear and/or manifest intention of the contracting parties that the contracts included material provisions for the safety and airworthiness and merchantability of the V-22 Osprey aircraft, gear boxes, pinions, chip detectors, propulsion systems, and other systems and their component parts as well as written manuals, guidance, instructions and/or warnings which primarily and directly benefited the aircrew who flew and who fly in the plane.

214. Plaintiffs' decedents were V-22 Osprey aircrew and were third-party beneficiaries of the contracts between these defendants and the United States government.

215. Defendants BELL and/or BOEING, individually, collectively, and/or in a joint venture breached their contracts for the creditor beneficiaries Plaintiffs' decedents by failing to meet their obligations as set forth herein because GUNDAM 22 and its component parts and systems was unsafe, defective, unairworthy and lacked adequate manuals, instructions, and/or warnings.

216. Defendants BELL and/or BOEING breached their contracts for the creditor beneficiaries Plaintiffs' decedents by failing to meet their obligations as set forth herein because GUNDAM 22 was designed, manufactured, assembled, supplied, and sold, by these defendants with a lack of reasonable care as required by the contracts.

217. Defendants BELL and/or BOEING breached their contracts for the creditor beneficiaries Plaintiffs' decedents by failing to meet their obligations as set forth herein because the defendants intentionally, recklessly and/or negligently provided false information about the safety, airworthiness, and reliability of V-22 Osprey aircraft, gear boxes, pinions, chip detectors, propulsion systems, and other systems and their component parts as well as written manuals, guidance, instructions and/or warnings.

218.   As a direct and/or proximate result of these defendants' breaches of their contracts, GUNDAM 22 crashed, Plaintiffs' decedents lost their lives, and Plaintiffs, and each of them, have suffered pecuniary and non-pecuniary damages exceeding $75,000.00.

WHEREFORE, Plaintiffs demand judgment against Defendants BELL and/or BOEING, individually and/or jointly and/or severally, for all economic damages allowed under Pennsylvania or other applicable law, for economic and non-economic damages allowed under the Pennsylvania Survival Act and the binding precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971), for attorneys fees and costs of suit, for pre-judgment interest, post-judgment interest, and all other relief the Court deems fair and equitable.

### COUNT XI
### Civil Conspiracy Under Pennsylvania Law
### *Plaintiffs v. All Defendants*

219.   At all times material, all Defendants, and each of them, acted for a common purpose to do an unlawful act and/or to do a lawful act by unlawful means or unlawful purpose, specifically:

a.   All Defendants acted for the common purpose of increasing their profits at the expense of safety of flight and to the detriment of Plaintiffs' decedents rights and bodily safety;

b. All Defendants misrepresented that their alloy, pinions, gear boxes, and aircraft complied as required with applicable laws, regulations, specifications, requirements, and standards when they intentionally, recklessly, carelessly, and/or negligently knew that they did not;

c. All Defendants acted for the common purpose of increasing their profits by unlawfully misrepresenting the material condition of their alloy, aircraft, gear boxes, pinions, chip detector systems, and/or other component parts and systems;

d. Defendants Bell and/or Boeing acted for the common purpose of increasing their profits by unlawfully concealing, and/or omitting material information about the Osprey;

e. Defendants Bell and/or Boeing acted for the common purpose of increasing their profits by unlawfully generating false material information about the Osprey.

220. Defendants made multiple overt acts to further the common purpose as set forth in detail above including, at a minimum, making affirmative false representations to the authorities and through advertising, manufacturing, assembling, and/or supplying defective products in the Commonwealth of Pennsylvania. **(Exhibits A, B, and C).**

221.   As a direct and/or proximate result of the above overt acts, Plaintiffs have suffered actual legal damage in excess of $75,000 for each Plaintiff.

WHEREFORE, Plaintiffs demand judgment against All Defendants, individually and/or jointly and/or severally, for all economic damages allowed under Pennsylvania or other applicable law, for economic and non-economic damages allowed under the Pennsylvania Survival Act and the binding precedential holding of *Dugas v. Nat'l Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971), for attorneys fees and costs of suit, for pre-judgment interest, post-judgment interest, and all other relief the Court deems fair and equitable

## JURY TRIAL DEMANDED

Plaintiffs hereby respectfully demand that a jury trial be conducted with respect to all issues and claims pursuant to Pennsylvania state law, any other applicable law, and the Seventh Amendment to the United States Constitution.


Dated: August 7, 2025              Respectfully submitted,

                                   By: */s/ John J. Gagliano*
                                   John J. Gagliano (Pa. ID 309438)
                                   GAGLIANO LAW OFFICES
                                   18 Campus Blvd., Suite 100
                                   Newtown Square, PA 19073
                                   Telephone: (215) 554-6170
                                   john@gagliano.law

                                   and

Timothy A. Loranger (*pro hac vice pending*)
tloranger@wisnerbaum.com
Ari S. Friedman (*pro hac vice pending*)
afriedman@wisnerbaum.com
F. Phillip Peche (*pro hac vice pending*)
ppeche@wisnerbaum.com
WISNER BAUM LLP
11111 Santa Monica Blvd. Ste. 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233

*Attorneys for Plaintiffs*